# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00221-CR

**Michael Grace, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 6 OF TRAVIS COUNTY
### NO. C-1-CR-13-211885, HONORABLE BRANDY MUELLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following the denial of his motion to suppress evidence, appellant Michael Grace pleaded no contest to the offense of driving while intoxicated.[1]  Punishment was assessed at confinement in the Travis County Jail for one year and a $4,000 fine, but the trial court suspended imposition of the sentence and placed Grace on community supervision for a period of two years. In a single point of error on appeal, Grace asserts that the trial court abused its discretion in denying the motion to suppress.  We will affirm the trial court's judgment.

## BACKGROUND

Grace was arrested for driving while intoxicated following a traffic stop.  The sole issue at the suppression hearing was whether the officer who had initiated the traffic stop had

---

[1]  *See* Tex. Penal Code §§ 49.04, .09(a).

reasonable suspicion to detain Grace. At the hearing, the trial court heard evidence that at approximately 2:00 a.m. on July 7, 2013, Cary Allen, a doorman at Ego's Karaoke Bar in Austin, observed a customer, later identified as Grace, leaving the bar with another person and getting into a vehicle in the parking lot. Allen testified that he believed Grace to be intoxicated and proceeded to call 911. A recording of the 911 call was admitted into evidence. On the call, Allen can be heard telling the dispatcher, "I need to report a drunk driver." Allen explained to the dispatcher that Grace had left the bar "intoxicated" and that Allen had "urged him not to drive." Allen added, "We've had police here before, and they told me it's always better to catch them in the car before they leave, rather than waiting until they leave the property and then calling the cops." Allen also reported the name and location of the bar, the color and model of the car ("a blue Scion"), the license-plate number, and a physical description of Grace. During the call, Allen also identified himself and his occupation and indicated that he would be willing to speak with the police in person "if they need to talk to me." Later in the call, Allen reported that Grace and the passenger in his vehicle were still in the parking lot, "just sitting in the car with the lights on." The dispatcher informed Allen that an officer was en route to the bar and asked Allen to call again if Grace left the bar in his vehicle. Shortly thereafter, Allen called 911 a second time and reported that Grace had driven away and informed the dispatcher of the direction Grace was headed. On cross-examination, Allen acknowledged that he had not relayed to the dispatcher the amount of drinks that Grace had consumed at the bar or specified other underlying grounds for his belief that Grace was "intoxicated." Allen further acknowledged that he had not specified to dispatch any personal experience or training that he had in identifying intoxicated individuals.

2

Officer Larry Wright of the Austin Police Department responded to the call. Wright testified that dispatch had provided him with a description of the vehicle and the driver, the license-plate number of the vehicle, the name and phone number of the person who had called 911, and the location of the vehicle and the direction it was headed. Wright recounted that as he was headed toward that location, he observed a vehicle matching the description that had been given to him, "verified the license plate in the call with the one [he] was seeing in front of [him]," and initiated a traffic stop on the vehicle. On cross-examination, Wright acknowledged that the report from dispatch relayed no specific information regarding the condition of the driver other than that he was "intoxicated." Wright also acknowledged that dispatch had provided him with no information regarding the experience or training of the caller in identifying whether someone was intoxicated. Wright further testified that, prior to initiating the traffic stop, he had not observed the vehicle commit any traffic violations such as swerving or speeding, and he agreed with defense counsel's statement that he "didn't observe any kind of indications that would normally hint that maybe something is wrong." However, Wright added that he knew the vehicle was leaving a bar at approximately 2:00 a.m., when "bars usually close" and "they start filtering people out." Wright also testified that he was familiar with Ego's Karoke Bar because he and other officers had responded to calls of "[f]ights or public intoxication [] or DWI . . . from that bar numerous times."

Following argument, the trial court denied the motion to suppress. Grace subsequently pleaded no contest to driving while intoxicated and was placed on community supervision as noted above. This appeal followed.

3

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for abuse of discretion.[2] We are to view the record "in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'"[3] "We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case."[4] "The appellate court must apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations."[5]

Here, the historical facts elicited at the suppression hearing are not in dispute. Therefore, the controlling question is legal: "whether these uncontroverted facts created a reasonable

---

[2] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[3] *Id*. (quoting *Dixon*, 206 S.W.3d at 590); *see Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex. Crim. App. 1991) (op. on reh'g).

[4] *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

[5] *Martinez v. State*, 348 S.W.3d 919, 922-23 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)).

suspicion such that [Officer Wright] was justified in initiating a [traffic] stop."[6] Accordingly, we review de novo the trial court's reasonable-suspicion determination.[7]

**ANALYSIS**

In Grace's sole point of error, he asserts that the trial court abused its discretion in denying his motion to suppress because, he contends, Officer Wright did not have reasonable suspicion to initiate the traffic stop. In Grace's view, Allen did not provide sufficient information to dispatch so as to justify Wright's stop of the vehicle. In response, the State argues that the totality of circumstances known to Wright when he initiated the stop, "viewed through the prism of [his] particular level of knowledge and experience," objectively supports the trial court's conclusion that the officer had "reasonable suspicion to believe that criminal activity was afoot."

"Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion."[8] "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity."[9] "These facts must show unusual activity, some evidence that connects the detainee to the unusual activity, and some indication that the

---

[6] *Id*.

[7] *See id*.

[8] *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (citing *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005)).

[9] *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010)).

unusual activity is related to crime."[10] "This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention."[11] "It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified."[12] "'[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts.'"[13]

"Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'"[14] "A 911 police dispatcher is ordinarily regarded as a 'cooperating officer' for purposes of making this determination."[15] "Finally, information provided to police from

---

[10] *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013).

[11] *Derichsweiler*, 348 S.W.3d at 914 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

[12] *Id*. (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *Sokolow*, 490 U.S. at 9-10; *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

[13] *Id*. (quoting *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997)).

[14] *Id*. (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972); *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)); *see also United States v. Hensley*, 469 U.S. 221, 232-33 (1985) (officer may detain suspect based upon police bulletin so long as issuing entity has reasonable suspicion to justify detention); *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all.").

[15] *Derichsweiler*, 348 S.W.3d at 914 (citing *United States v. Whitaker*, 546 F.3d 902, 909 n.12 (7th Cir. 2008); *United States v. Ruidiaz*, 529 F.3d 25 (1st Cir. 2008); *United States*

a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable."[16] "In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot."[17] "'Although an officer's reliance on a mere 'hunch' is insufficient to justify an investigatory stop, . . . the likelihood of criminal activity need not rise to the level required for probable cause.'"[18] "A reasonable-suspicion determination requires looking at the totality of the circumstances and reasonable suspicion may exist even if those circumstances standing alone may be just as consistent with innocent activity as with criminal activity."[19]

As an initial matter, we observe that Grace, in his brief, relies primarily on cases in which the police were provided information by anonymous callers.[20] Such information can be

---

*v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003); *United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir. 1994)).

[16] *Id*. (citing *Adams*, 407 U.S. at 147).

[17] *Id*. (citing *Texas v. Brown*, 460 U.S. 730, 742-43, 103 (1983) (plurality opinion)).

[18] *Kerwick*, 393 S.W.3d at 273-74 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

[19] *Id*. (citing *York v. State*, 342 S.W.3d 528, 536 (Tex. Crim. App. 2011)).

[20] *See Florida v. J.L.*, 529 U.S. 266, 268 (2000) (anonymous caller reported to police that individual was carrying firearm); *Davis v. State*, 989 S.W.2d 859, 861-62 (Tex. App.—Austin 1999, pet. ref'd) ("unidentified female caller of unknown veracity" reported to police that vehicle was being driven recklessly); *see also State v. Garcia*, No. 03-14-00048-CR, 2014 Tex. App. LEXIS 9624, at *1 (Tex. App.—Austin Aug. 28, 2014, no pet.) (mem. op., not designated for publication) (caller who identified himself only as "Eric" had reported "a possible intoxicated driver in line at the to-go line" for nearby fast-food restaurant).

considered unreliable and require independent corroboration by the police before it may support a finding of reasonable suspicion.[21] But, as the State correctly observes, this is not a case in which the police were relying on an anonymous caller. Here, Allen had provided his full name, occupation, and place of business to the 911 dispatcher, and he also indicated to the dispatcher that he would be willing to speak to the police in person if they needed more information. Accordingly, the record supports a finding by the trial court that Allen was an identified citizen-informant and thus that his account would be more reliable than an anonymous account would have been.[22]

The next step in the analysis is to consider the content of Allen's account. "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'"[23] "Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'"[24] "[T]he behavior alleged by the 911 caller, 'viewed from the standpoint of an objectively reasonable police officer, [must] amount to reasonable suspicion' of drunk driving" or other criminal activity.[25] For example, in *Navarette v. California*, a recent Supreme Court decision, a 911 caller reported "more than a conclusory allegation of drunk or reckless driving. Instead, she alleged a specific and

---

[21] *See Alabama v. White*, 496 U.S. 325, 328-32 (1990); *Martinez*, 348 S.W.3d at 923.

[22] *See Illinois v. Gates*, 462 U.S. 213, 233-34 (1983); *Derichsweiler*, 348 S.W.3d at 915-16.

[23] *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *White*, 496 U.S. at 330).

[24] *Id*. at 1690 (citing *Terry*, 392 U.S. at 30).

[25] *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

dangerous result of the driver's conduct: running another car off the highway."[26] Similarly, in *Nacu v. State*, a restaurant manager had reported to a police officer that a "woman had been in [her] restaurant, [the manager] noticed her to be intoxicated, and [the woman] had gotten in a car."[27] The manager also told the officer that the vehicle was "trying to drive between two metal poles" that were "not wide enough to allow [the] vehicle to pass."[28] The San Antonio Court of Appeals concluded that the manager's "explanation that the driver of a vehicle had previously been in her restaurant, was intoxicated, and trying to drive through metal poles too narrow to accommodate a car" provided the officer with "specific, articulable facts that would allow a reviewing court to determine whether [the] detention was objectively reasonable."[29]

In this case, although Allen had not reported any reckless driving, he had reported to the 911 dispatcher that Grace "was a guest at the bar," had "left intoxicated," and was "sitting in his car with the lights on," "drunk." Allen had also reported to the dispatcher that he was a doorman at the bar and that he had "urged [Grace] not to drive." From this information, the dispatcher could have reasonably inferred that Allen had interacted with Grace while Grace was at the bar or while he was leaving and that Allen had perceived signs of Grace's intoxication. Moreover, although Allen did not detail to the dispatcher his personal training or experience in identifying intoxicated individuals, he did inform the dispatcher that he was employed at Ego's, that police had previously

---

[26] *Id*. at 1691.

[27] *See* 373 S.W.3d 691, 693 (Tex. App.—San Antonio 2012, no pet.).

[28] *Id*.

[29] *Id*. at 696.

9

been at Ego's responding to calls of intoxicated individuals while Allen was working there, and that the police had told Allen that "it's always better to catch them in the car before they leave, rather than waiting until they leave the property and then calling the cops." From this information, combined with the information concerning Allen's occupation as a doorman at the bar, the dispatcher could have reasonably inferred that Allen had at least some prior experience identifying intoxicated individuals while working at the bar and that Allen was relying on that experience in concluding that Grace was intoxicated and should not be driving. In addition to these facts, Officer Wright testified that he knew that the vehicle had left the bar at approximately 2:00 a.m., when, Wright testified, "bars usually close" and "they start filtering people out." Also, Officer Wright testified that he was familiar with this particular bar because he and other officers had responded to calls of "[f]ights or public intoxication [] or DWI . . . from that bar numerous times."[30] Considering the totality of the above circumstances, the trial court would not have erred in concluding that Officer Wright, working in tandem with the 911 dispatcher, possessed specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that Grace had committed the offense of driving while intoxicated and in denying Grace's motion to suppress on that ground.[31]

---

[30] "Time and location are relevant and appropriate considerations when doing a totality of the circumstances review to determine whether or not reasonable suspicion exists." *Foster v. State*, 326 S.W.3d 609, 613 n.10 (Tex. Crim. App. 2010).

[31] *See, e.g.*, *Navarette*, 134 S.Ct. at 1692; *Derichsweiler*, 348 S.W.3d at 914-17; *Foster*, 326 S.W.3d at 614; *Curtis v. State*, 238 S.W.3d 376, 381 (Tex. Crim. App. 2007); *Brother v. State*, 166 S.W.3d 255, 257-60 (Tex. Crim. App. 2005); *Taflinger v. State*, 414 S.W.3d 881, 886-88 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Nacu*, 373 S.W.3d at 696; *see also Arvizu*, 534 U.S. at 274 (criticizing lower court's evaluation of facts supporting reasonable suspicion "in isolation from each other" and observing that *Terry* "precludes this sort of divide-and-conquer analysis"); *Tanner v. State*, 228 S.W.3d 852, 858 (Tex. App.—Austin 2007, no pet.) (observing that courts should not view each fact supporting stop "independently from the others" and holding that "when

We overrule Grace's sole point of error.

**CONCLUSION**

We affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Rose, Justices Pemberton and Field

Affirmed

Filed:   August 31, 2016

Do Not Publish

---

the time of night and location are viewed together and common sense is applied to the totality of these circumstances, we cannot conclude that the trial court erred in finding that the stop was supported by reasonable suspicion").

11