

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00041-CR

ANDREW STEPHEN CHAPMAN                                    APPELLANT

V.

THE STATE OF TEXAS                                            STATE

----------

### FROM COUNTY CRIMINAL COURT NO. 9 OF TARRANT COUNTY
### TRIAL COURT NO. 1411937

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

### I. INTRODUCTION

The State of Texas filed a motion for rehearing and a motion for en banc reconsideration of our opinion that issued on December 15, 2016. We deny the State's motion for en banc reconsideration, grant the State's motion for

---

[1]*See* Tex. R. App. P. 47.4.

rehearing, withdraw our opinion and judgment dated December 15, 2016, and substitute the following.

Appellant Andrew Stephen Chapman appeals the trial court's denial of his motion to suppress[2] after the trial court, upon his plea of guilty, convicted him of driving while intoxicated (DWI) enhanced by an allegation that his blood alcohol concentration (BAC) was .15 or more. In two issues, Chapman argues that the officers who initially detained him prior to the arresting officer's investigation into whether he was intoxicated possessed neither reasonable suspicion nor probable cause to detain him. We will affirm.

## II. BACKGROUND

Officer Jennifer Russell of the Fort Worth Police Department was the only witness to testify at the suppression hearing. Russell averred that she responded to a dispatch at roughly 11:30 p.m. on March 16, 2015, regarding a disturbance at a Sonic drive-in restaurant located at 301 University Drive in Fort Worth, Texas. Specifically, Russell stated that "[a]n employee had called in stating that there was a male that had -- wouldn't leave." When asked whether she ever saw Chapman "commit a violation" Russell said, "Yes. He was trespassing on a closed business that he was already told to leave."

---

[2]In the trial court, Chapman filed two suppression motions—one titled "Motion to Suppress" and the other titled "Motion to Suppress HGN Evidence." In his "Motion to Suppress," Chapman challenged his detention. In his other motion, Chapman challenged the quality and validity of the horizontal gas nystagmus test performed by Officer Russell. Chapman's arguments on appeal only address his detention, and thus we interpret his arguments as challenging the trial court's "Order" on his "Motion to Suppress" only.

2

According to Russell, she was not the first officer to arrive at the Sonic located at 301 University Drive in response to the dispatch. When asked on direct by defense counsel if there had been "two other officers that actually beat [her] there," Russell replied, "Yes." When further asked by defense counsel if the two officers who had "beat [her]" to the Sonic were "Officer Ramirez and Officer Ritchie" (First Responding Officers), Russell replied, "Yes, sir." She also affirmed that when she arrived, the First Responding Officers had begun a preliminary investigation and were maintaining personnel at the restaurant so that she could continue the investigation upon her arrival. Russell also said that the First Responding Officers had met with and detained the complaining witness and Chapman.

Russell said that she arrived to a scene wherein "[a] group of family members and employees [were] on one side of the Sonic and [Chapman's vehicle was] on the other side with the [First Responding Officers]." By Russell's account, shortly after she arrived, she determined that Chapman, who was sitting in his car with the engine running, was the man described in the dispatch and she spoke with him. Russell averred that Chapman was "agitated about not getting his food," that his responses to her questions were "slow and sluggish," that his "eyes were glassy and dilated," and that she detected "a smell of alcohol coming from either him or the car."

Russell said that based on observations from her conversation with Chapman, she decided to perform field-sobriety tests and investigate Chapman

3

further for the offense of DWI.  Russell said that after she decided to perform the field-sobriety tests, she went back to her patrol vehicle, drove it around the Sonic so that she could turn her in-car camera on as she conducted the tests, and that she then "pulled" Chapman out of his vehicle.

Footage from Russell's in-car camera shows Russell getting into her patrol vehicle, which was parked on the opposite side of the Sonic from where Chapman's vehicle was located.  Ten seconds later, a second officer is seen approaching.  A few seconds after that, the second officer can be seen walking back toward Chapman's vehicle, and then the footage displays a first-person's view of Russell's vehicle driving around the Sonic and stopping several meters from Chapman's car.  In the video frame, two other patrol vehicles can be seen in the entrance to the parking lot positioned behind Chapman's vehicle, effectively barricading him from leaving—the spotlights from those two vehicles can be seen aimed at Chapman's car.  From there, Russell can be seen exiting her vehicle and approaching Chapman's car on the driver's side.  As she approached Chapman's driver's side, an additional patrol vehicle can be seen pulling up behind the two patrol vehicles that were behind Chapman's car.  As the video depicts her nearing Chapman's vehicle, Russell can be heard stating, "Mr. Chapman, can you go ahead and turn off the car for me?"  And then she can be heard stating, "Why don't you step out for me, okay?"  Russell can then be seen walking toward the back of Chapman's vehicle, and Chapman can be seen opening his car door and stepping out.  Russell can then be heard stating, "Come

4

over here by my car." From there, the two of them can be seen walking toward an area in front of Russell's vehicle, where she began to question him and perform field-sobriety tests.

Russell averred that after she administered the horizontal gaze nystagmus, the walk-and-turn, and the one-leg-stand tests, she believed that Chapman was intoxicated. Russell said that after Chapman argued with her about the validity of the one-leg-stand test, she arrested him for DWI. Russell said that even though she had not seen Chapman commit a traffic violation, she determined that he had driven his vehicle to the Sonic.

Shortly after, Russell obtained a warrant to draw Chapman's blood, the results of which indicated that Chapman's BAC was .206 at the time of the draw. The trial court denied Chapman's suppression motion. The trial court stated that Chapman's initial detention was supported by Russell's testimony that "he was asked to leave and didn't leave the premises."

After the trial court denied his suppression motion, Chapman entered into a plea agreement with the State. In accordance with the plea agreement, the trial court sentenced Chapman to pay a $1,500 fine and to serve 120 days in jail, probated for eighteen months. Chapman's appeal of the suppression motion followed.

## III. THE STATE'S CROSS-ISSUES

In its three cross-issues, the State argues that Chapman waived all rights of appeal and that this court therefore lacks jurisdiction of this appeal, that the

existing certification of the right of appeal is defective, and that the record does not reflect that the trial court gave Chapman permission to appeal.

Chapman's timely notice of appeal vested this court with jurisdiction to ascertain whether he is permitted to appeal under rule 25.2(a) because of his plea-bargain. *See* Tex. R. App. P. 25.2(a) (delineating circumstances when plea-bargain defendant may still appeal certain issues); *see also Chavez v. State*, 183 S.W.3d 675, 680 (Tex. Crim. App. 2006) ("A court of appeals, while having jurisdiction to ascertain whether an appellant who plea-bargained is permitted to appeal by Rule 25.2(a)(2), must dismiss a prohibited appeal without further action, regardless of the basis for the appeal."). But there still remain the issues of whether Chapman validly waived his right to appeal the denial of his motion to suppress or whether the trial court nonetheless granted Chapman permission to appeal. In light of the State's three cross-issues and Chapman's motion to abate, and because the clerk's record contained both a boilerplate signed waiver of appeal by Chapman as well as a signed certification by the trial judge stating that Chapman had the right to appeal matters ruled on prior to his plea, we abated this case for the trial court to file an amended certification reflecting that it had given Chapman permission to appeal (if that were the case) or, alternatively, if the trial court had not given Chapman permission to appeal, we directed the trial court to conduct a hearing and make essential findings to aid us in determining whether Chapman intentionally, knowingly, and voluntarily waived his right to appeal. The trial court filed an amended certification reflecting that it

6

had given Chapman permission to appeal in this plea-bargained case. Whether the waiver was valid is therefore now moot. Accordingly, we overrule the State's three cross-issues.

## IV. THE REASONABLENESS OF CHAPMAN'S DETENTION

In his two issues, Chapman makes the broad arguments that neither the First Responding Officers nor Russell possessed either reasonable suspicion or probable cause to initially detain him prior to the investigation into his intoxication and thus the trial court erred by denying his motion to suppress. We disagree. And because we conclude and hold that the collective information held by the officers in this case at the time they detained him prior to forming reasonable suspicion that Chapman was intoxicated amounted to, at a minimum, reasonable suspicion to detain him, we need not address Chapman's arguments pertaining to whether the officers possessed probable cause.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex.

7

Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We must also afford the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex.

8

Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

### B.    Warrantless Detentions

Under the Fourth Amendment, a warrantless detention of a person that amounts to less than a full-blown custodial arrest must be justified by reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) ("[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.") (internal quotation marks omitted); *Brown v. Texas*, 443 U.S. 47, 51, 99 S. Ct. 2637, 2641 (1979) (reasoning the same). A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880 (1968). This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. *Id.* It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 695 (1981) ("[T]he essence of all that has been written is that the totality of the circumstances—the

9

whole picture—must be taken into account."). "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular types of noncriminal acts." *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App.), *cert. denied*, 565 U.S. 840 (2011). Rather, it is the cumulative information known to the cooperating officers at the time of the stop that is to be considered in determining whether reasonable suspicion exists. *Id.* And a 911 police dispatcher is ordinarily regarded as a cooperating officer for purposes of making this determination. *Id.* Finally, information provided to police from a citizen-informant who identifies herself and may be held to account for the accuracy and veracity of her report may be regarded as reliable. *Id.* at 915. In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot. *Id.* at 915–16.

### C. Reasonable Suspicion Existed to Justify the First Responding Officers Detaining Chapman

Viewing the evidence in the light most favorable to the trial court's ruling, including all reasonable inferences that may be drawn from that evidence, the record indicates that the First Responding Officers, as well as Russell and a fourth unidentified officer, all responded to a 911 dispatch that a man refused to

10

leave the Sonic located at 301 University Drive in Fort Worth, Texas, at roughly 11:30 p.m. on March 16, 2015. As each of the officers arrived at the specific location, it was evident that a man was sitting in his running car at the Sonic with all the employees having gathered on the opposite side of the restaurant. These specific, articulable facts, combined with the rational inferences from these facts, would have led any one of the four responding officers to reasonably conclude that Chapman may have been committing criminal trespass. *See* Tex. Penal Code Ann. § 30.05(a) (West Supp. 2010) (defining criminal trespass to have occurred if a "person enters or remains on or in property of another . . . without effective consent and the person: (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so."). The officers' reasonable suspicion was strengthened by the fact that when they arrived, they spoke with the employee who had called 911 to report the disturbance. Indeed, Russell testified that the First Responding Officers had spoken with the complaining witness.

Of his many complaints, Chapman argues that the record does not indicate that the First Responding Officers were even responding to the same dispatch that Russell was and that the record is devoid of what facts the First Responding Officers knew before detaining Chapman. But Russell testified that the First Responding Officers were responding to the same dispatch that she was and that they "beat [her]" to the Sonic and made contact with Chapman and the complaining witness just prior to her arrival. Russell's testimony is confirmed by

11

video from Russell's in-car camera. In the video, as Russell drove around the Sonic to position her vehicle's camera to capture the field-sobriety tests, two other patrol vehicles can be seen in the entrance to the parking lot positioned behind Chapman's vehicle, effectively barricading him from leaving, and a fourth (including Russell's) patrol vehicle can be seen arriving and pulling in behind the two patrol vehicles that were blocking Chapman. The reasonable inference from this evidence is that all four of the patrol vehicles were arriving in response to the same 911 dispatch within minutes of one another.

Furthermore, it is not relevant what the First Responding Officers knew regarding the 911 dispatch, and thus it is not relevant that the record does not indicate what they knew about it. What is legally significant is the cumulative information known to all of the officers—including the First Responding Officers, Russell, and the 911 dispatcher—at the time the First Responding Officers first detained Chapman. *See Derichsweiler*, 348 S.W.3d at 914 (holding that first arriving officer was justified in detaining suspect even though he was unaware of suspicious activity that warranted 911 call because the cumulative knowledge of all cooperating officers formed reasonable suspicion).

Through several arguments, Chapman also questions the reliability of the Sonic employee who called 911. Chapman essentially argues that the employee is somehow similar to an anonymous tipster. The record, however, indicates that the Sonic employee who called 911 remained on the scene and spoke with the First Responding Officers. Thus, the informant held herself accountable for the

12

accuracy and veracity of her report, and thus her report may be regarded as reliable. *See id.* at 915–16 ("[I]nformation provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable.").

Chapman also challenges the reasonableness of the scope and duration of his detention. But viewing the evidence in a light most favorable to the trial court's ruling, the evidence shows that the First Responding Officers arrived mere moments before Russell arrived and that Russell had formed a new and independent reasonable suspicion that Chapman was intoxicated immediately upon speaking with him and within minutes of her arrival. *See St. George v. State*, 197 S.W.3d 806, 817 (Tex. App.—Fort Worth 2006) ("[I]f reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled."), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007).

Finally, Chapman takes issue with Russell's testimony that "[t]hey barricaded him in." Chapman seems to imply that the Sonic employees barricaded Chapman in the Sonic parking lot and that somehow this undermines the reasonable suspicion held by the officers. But a reasonable reading of the record indicates that the "they" that Russell was referring to were the First Responding Officers. This is a reasonable reading of the record for two reasons. First, Russell's comment that "[t]hey barricaded him in" was in response to

questions by the State on cross-examination and was effectively a summation of what she had explained on direct examination—that a 911 call had been made regarding a man who would not leave Sonic, that the First Responding Officers had arrived before her, and that they had detained Chapman. Second, the video from Russell's in-car camera clearly shows that the only obstacles blocking Chapman in were the two patrol vehicles that had pulled in behind Chapman as the officers who manned those vehicles responded to the dispatch.

In short, we hold that the trial court did not err by concluding that the First Responding Officers had reasonable suspicion to detain Chapman based on the Sonic employee's 911 call coupled with the First Responding Officers' observations that Chapman was in his running car which was parked at the specific Sonic from which the disturbance call originated. *See Nacu v. State*, 373 S.W.3d 691, 695, 697 (Tex. App.—San Antonio 2012, no pet.) (holding that informant who identified herself only as a "manager of a restaurant" who reported that driver of vehicle had previously been in her restaurant and was intoxicated coupled with details of vehicle's location gave detaining officer specific, articulable facts sufficient for investigative detention). Thus, the trial court did not err by denying Chapman's motion to suppress; we overrule the portions of his two issues pertaining to whether the First Responding Officers had reasonable suspicion, and we need not address whether they possessed probable cause.

14

## V. CONCLUSION

Having held that the trial court was correct in determining that the First Responding Officers had reasonable suspicion to detain Chapman, we overrule the portions of his two issues pertaining to his arguments regarding reasonable suspicion and need not address his two issues to the extent that he argues the First Responding Officers did not possess probable cause. Thus, we affirm the trial court's "Order" denying Chapman's "Motion to Suppress" and we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: WALKER and MEIER, JJ.[3]

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 27, 2017

---

[3]Justice Lee Ann Dauphinot was a member of the original panel but has since retired. The two remaining justices ruled on the State's motion for rehearing. See Tex. R. App. P. 49.3. The then-existing en banc court for this case ruled on the motion for en banc reconsideration. See Tex. R. App. P. 41.2(a).

15